UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILLIE EDMONDSON, ) | |
| ANTWAN MCGLORY, ) | |
| JOVAN MULLINS, and ) | |
| THOMAS BATTLE ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 3:22-cv-00513 |
| v. ) | |
| ) | |
| NISSAN NORTH AMERICA INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

The instant case arises from alleged racially discriminatory conduct targeting four individuals at their workplace. Nissan North America Inc. ("Nissan") has filed a Motion to Dismiss (Doc. No. 23). But, as proven through the parties' extensive briefing (Doc. Nos. 24, 28, 31), the Amended Complaint (Doc. No. 18) is thorough, and, at a minimum, plausibly states the majority of Plaintiffs' claims. For the following reasons, the Court will grant in part and deny in part Nissan's Motion (Doc. No. 23).

**I.   FACTUAL ALLEGATIONS AND BACKGROUND[1]**

Prior to the events giving rise to this lawsuit, Antwan McGlory, Jovan Mullins, Thomas Battle, and Willie Edmonson Jr.—all Black men—had worked at Nissan's facility in Smyrna for at least four years. (Doc. No. 18 ¶¶ 16–19). However, Nissan was not their formal employer; they were hired by Onsite South, LLC ("Onsite"), a company that "ran what is fairly described as a car

---

[1] The Court relies on the relevant factual allegations from the Amended Complaint (Doc. No. 18) and assumes they are true for purposes of ruling on the instant motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

dealership for Nissan employees and others authorized to participate in Nissan's Employee Lease Vehicle Program." (Id. ¶¶ 7, 9, 12).

Mike Brown worked for Nissan as a Corporate Vehicles Senior Manager, and, in that role acted with management authority at the Smyrna facility. (Id. ¶¶ 24, 25). Although Brown should not have had authority over Onsite employees, he asserted authority and control over the working conditions of Plaintiffs and other Onsite employees. (Id. ¶¶ 27–28). Brown regularly told Plaintiffs how and what they should be doing in the performance of their work at the Smyrna facility, (id. ¶ 31), criticized Plaintiffs' work performance, (id. ¶ 32), and required Plaintiffs to perform tasks at his direction, stating that he had the authority and ability to discipline Plaintiffs for supposed "policy violations." (Id. ¶ 34). On multiple occasions, Brown provided input concerning the management, staffing, and performance of Onsite employees to Onsite management and executive leadership. (Id. ¶ 37).

Brown—who is white—acted less confrontationally towards other white Onsite and Nissan employees. (Id. ¶¶ 26, 36). And Nissan had been made aware of allegations that Brown had harassed at least one other Black Onsite employee. (Id.).

On August 17, 2021, Brown attempted to discuss changing Onsite's management and staffing at the Smyrna facility and was rejected. (Id. ¶ 38). Over the next day, Brown and a white Onsite employee, Kimberly Warren, agreed to forge a written complaint against Plaintiffs. (Id. ¶¶ 38–39). But rather than submit the complaint to Onsite's human resources or management teams in compliance with Onsite's protocols, Warren handed it to Brown. (Id. ¶¶ 43–44). Brown then forwarded the complaint to Onsite's President, Director of Production, and Director of Accounting and Administration. (Id. ¶ 45).

Warren's complaint referred to Onsite's Black employees as "lazy[,]" "convicted felons[,]" and stated that she was resigning because Edmondson Jr. only hired "one specific race" and never promoted her due to the "color of her skin." (Id. ¶ 46). Onsite, aware that Warren had expressed similar sentiments before and that certain allegations were categorically false (Edmonson Jr. had recommended that Onsite promote Warren), concluded that Warren's complaint was unfounded and likely the result of racial bias. (Id. ¶¶ 48–50).

In September 2021,[2] Nissan received an anonymous complaint about Plaintiffs that it did not immediately share with Onsite. (Id. ¶¶ 59–62). On September 17, 2021, Brown emailed Onsite leadership, informing them that Plaintiffs were no longer permitted on any Nissan property.[3] (Id. ¶¶ 64–69). Onsite's President responded to the email asking for more information that day, and, when he did not receive a reply, emailed multiple Nissan employees over the course of three weeks to no response. (Id. ¶¶ 77, 81, 90–91). On October 4, 2021, Glenn Plosa, a member of Nissan's Legal Department, responded, writing, "On or about September 13, 2021, Nissan became aware of a complaint through its anonymous tip line alleging an [sic] unsafe and potentially dangerous work conditions." (Id. ¶¶ 93–94). Plosa informed Onsite that the complaint included allegations that Edmonson Jr. yelled at Onsite employees and that Plaintiffs brought guns, munitions, and drugs onto Nissan's property. (Id. ¶¶ 95–96). Plosa also informed Onsite that Nissan had conducted an investigation into the matter and based on its purported findings, "decided that these Onsite employees' access to Nissan facilities should be revoked." (Id. ¶¶ 99, 105). Nissan did not

---

[2] That same month, Brown also asked another white Onsite employee if she was interested in being the Smyrna facility's Site Manager—a position held at the time by Edmonson Jr. (Doc. No. 18 ¶¶ 55–57).
[3] Every Onsite operation in Tennessee was on a Nissan property. (Doc. No. 18 ¶ 74).

3

provide Onsite with any investigation materials to support its decision. (Id. ¶ 107). In December 2021, Nissan notified Onsite of its intent to end the companies' business relationship. (Id. ¶ 123).

In March 2022, Plaintiffs filed Charges of Discrimination with the EEOC, which issued Plaintiffs right to sue letters on or about September 12 of that same year. (Id. ¶ 5). Plaintiffs then brought the instant suit. (Doc. No. 1). In their operative pleading (Doc. No. 18), Plaintiffs brought claims alleging Nissan violated 42 U.S.C. § 1981 ("Section 1981" or "§ 1981"); violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"); tortiously interfered with Plaintiffs' relationship with Onsite under Tennessee common law; and intentionally and/or negligently inflicted emotional distress under Tennessee common law. (Doc. No. 18 ¶¶ 144–181).

In support of their discrimination claims, Plaintiffs point to Nissan's disparate treatment of a White employee, Bobby Moss, who brought a handgun to a Nissan facility in December 2021. (Id. ¶¶ 131–32). Unlike its action following the anonymous complaint against Plaintiffs, Nissan did not open an investigation or unilaterally revoke Moss's access to Nissan facilities. (Id. ¶ 134–35). Instead, Nissan instructed its human resource team to speak with Moss and inform him that firearms are not allowed on the property. (Id. ¶ 136).

## II. LEGAL STANDARD

A motion to dismiss filed under Rule 12(b)(6) requires that the Court must accept as true all the well-pleaded allegations contained in the complaint and construe the complaint in the light most favorable to the Plaintiff. Morgan v. Church's Fried Chicken, 829 F.2d 10, 11–12 (6th Cir. 1987). Although the complaint need not contain detailed factual allegations, the factual allegations supplied must be enough to show a plausible right to relief. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555–61 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim is facially

4

plausible when the Plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

To state a plausible claim for relief, the alleged facts must provide "more than a sheer possibility that a defendant has acted unlawfully." Mik v. Federal Home Loan Mortg. Corp., 743 F.3d 149, 157 (6th Cir. 2014) (quoting Iqbal, 556 U.S. at 678). Furthermore, to avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all the material elements of the claim. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

### III. ANALYSIS

Nissan's motion and accompanying memorandum of law (Doc. Nos. 23, 24) challenge each of Plaintiffs' causes of action. Because several of Nissan's arguments may be disposed of on a determination that Nissan was Plaintiffs' joint employer, the Court will start there.

### A. Section 1981 and Title VII

#### i. Plaintiffs' Allegations Open Nissan to § 1981 and Title VII Liability as Plaintiffs' Joint Employer.

Both § 1981 and Title VII protect individuals from certain forms of discrimination by their employers. See Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 611 (6th Cir. 2003) (quoting 42 U.S.C. § 2000e-2); see also Rogers v. Henry Ford Health Sys., 897 F.3d 763, 771 (6th Cir. 2018) ("We review claims of alleged race discrimination [and retaliation] brought under § 1981 ... under the same standards as claims of race discrimination brought under Title VII...."). However, the same liability may be imposed on an entity that is not a plaintiff's formal employer where the third-party constitutes a "joint employer." Nethery v. Quality Care Invs., L.P., 814 Fed. App'x 97, 102–04 (6th Cir. 2020).

An entity qualifies as a joint employer—and becomes subject to the same liability—if it "share[s] or co-determine[s] those matters governing essential terms and conditions of employment" despite the lack of a formal employer-employee relationship. See EEOC v. Skanska USA Bldg., Inc., 550 Fed. App'x 253, 256 (6th Cir. 2013) (citing Carrier Corp. v. NLRB, 768 F.2d 778, 781 (6th Cir. 1985)). Those essential terms and conditions include "an entity's ability to hire, fire[,] or discipline employees, affect their compensation and benefits, and direct and supervise their performance." Id. This determination is made holistically by looking at the totality of the factors in the aggregate rather than requiring satisfaction of all the factors. See Sanford v. Main St. Baptist Church Manor, Inc., 327 Fed. App'x 587, 594 (6th Cir. 2009).

The parties agree that Onsite, not Nissan, directly employed Plaintiffs. (Doc. No. 18 ¶¶ 16–19, 149). But, based on the facts as pled, and assuming them to be true, Nissan may qualify as a joint employer. Brown, as a member of Nissan's management team, wielded disciplinary power over Plaintiffs, and threatened that he "c[ould] have [Plaintiffs] fired anytime [Brown] want[ed]." (Id. 35-36). Brown also directly communicated with Onsite to advise and give feedback on Plaintiffs in an attempt to control management decisions regarding Plaintiffs' jobs. (Id. ¶ 37). While at least on one occasion, Onsite rejected Brown's advice, his actions were supervisory in nature. (Id. ¶ 37-38). Nissan unilaterally also conducted its own investigation after it received the anonymous complaint and prohibited Plaintiffs from entering the facilities despite having contractually delegated staffing responsibilities to Onsite, (id. ¶¶ 65-74), and barred Plaintiffs from entering the facility after the investigation.

Rather than squarely address these allegations, Nissan relies largely on the Professional Services Agreement between Nissan and Onsite (the "PSA") to demonstrate that Onsite retained control over all of the hallmarks of an employer. But this fails in the face of the Amended

Complaint's allegations. Whether these alleged acts occurred pursuant to the PSA or despite it makes no difference.

Nissan's remaining arguments—that Onsite retained exclusive control over Plaintiffs' compensation, lack of material effect of blocking Plaintiffs' access to Nissan facilities on their employment ability, and that Plaintiffs previously stated that Brown lacked management, disciplinary, supervisory, or staffing authority—likewise do not move the needle. Control of compensation is just one of several factors the Court must consider. See Sanford, 327 Fed. App'x at 594. And Nissan infers far more, in its favor, than reasonable from Plaintiffs' prior statement. Both versions of the complaint make clear that Brown had no legitimate authority over Plaintiffs but was permitted to act as if he did. (Compare Doc. No. 1; with Doc. No. 18).

    ii.   Plaintiffs Allege Prima Facie Cases Under § 1981 and Title VII.

With Nissan falling within the ambit of § 1981 and Title VII liability, Plaintiffs' prima facie case under both laws appears robust. In short, Plaintiffs have alleged that Nissan violated § 1981 by interfering with their right to make and enforce contracts for employment with Onsite on the basis of their race that significantly damaged their ability to access employment opportunities within Onsite,[4] (Doc. No. 18 ¶¶ 153). Further, Plaintiffs allege Nissan plausibly discriminated against them in a number of ways on account of their race in violation of Title VII. (Id. ¶ 151). At this stage of the litigation, the identified comparator, Bobby Moss, who, as alleged, actually brought a gun to the facility and received far more favorable treatment suffices. These claims will go forward.

---

[4] Plaintiffs' at-will employment status does not foreclose their claim. Fite v. Comtide Nashville, LLC, 686 F. Supp. 2d 735, 750 (M.D. Tenn. 2010) ("an 'at will' employee (like plaintiffs here) may still sue for discriminatory discharge under Section 1981") (citing Person v. Progressive Logistics Services LLC, 418 F. Supp. 2d 1006, 1011–12 (E.D. Tenn. 2006) (collecting cases)).

B. Tortious Interference

Next, Nissan argues that Plaintiffs' tortious interference claim fails because Plaintiffs have not pleaded Nissan's intent and improper means to tortiously interfere between Plaintiffs' and Onsite's business relationship. (Doc. No. 24 at 25-26).

Under Tennessee law, "improper means" are those that "are illegal, independently tortious, or that violate an established standard of a trade or profession." Watson's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007). According to Defendants, Plaintiffs have established that there was a known contract between Onsite and Nissan, and Nissan, by banning Plaintiffs, barred them from exercising their professional duties, but nothing more. (Doc. No. 24 at 24–25).

But Plaintiffs' pleading details Brown's repeated attempts to control management and staffing decisions for Onsite employees, (Doc. No. 18 ¶¶ 35–36), and Nissan's agreement with Onsite expressly allocated these supervisory and disciplinary responsibilities to Onsite, not Nissan. (Id. ¶¶ 12, 14). Plaintiffs also pleaded facts demonstrating that Brown sought to have Plaintiffs removed from their positions. (Id. ¶¶ 35–39). By conducting its own investigation without involving Onsite leadership in the process, Nissan ran afoul of the companies' agreement. (Id. ¶¶ 12–14, 118). Despite Nissan's argument to the contrary, (Doc. No. 24 at 25–26), these facts are sufficient to establish both intent to interfere and improper means.

C. Intentional and Negligent Infliction of Emotional Distress

Last, Nissan argues that Plaintiffs' intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") claims must fail because Plaintiffs have not alleged enough facts to describe: (1) a duty owed by Nissan to the Plaintiffs, or (2) conduct that is

8

outrageous enough to meet the threshold required for either claim. (Doc. No. 24 at 28–29). The Court will focus on Nissan's second argument, as it is dispositive.

Plaintiffs have not alleged sufficient facts to meet the high threshold for outrageous conduct required for an IIED or NIED claim. While Brown's racially charged statements and Warren's unfounded complaint are worthy of condemnation, these actions fall short of the level of outrageousness required. Under Tennessee law, "the nature of the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in civilized society." Sasser v. Quebecor Printing (USA) Corp., 159 S.W.3d 579, 585 (Tenn. Ct. App. 2004) (internal quotation marks and citation omitted). The allegations in the Amended Complaint, as Plaintiffs admit in their own brief, fall short of this standard. (Doc. No. 28 at 30 ) ("In full candor to the Court, Plaintiffs agree that the 'high threshold standard' furnishes Nissan plausible grounds for dismissal of these tort claims from its perspective. If the Court were inclined to rule in favor of Nissan on these claims, it would neither shock nor offend Plaintiffs['] expectations.").

### IV. CONCLUSION

For the forgoing reasons, Nissan's Motion to Dismiss (Doc. No. 23) will be granted in part and denied in part.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

9

Case 3:22-cv-00513   Document 41   Filed 09/27/23   Page 9 of 9 PageID #: 661