# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **WILLIE EDMONDSON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 3:22-cv-00513** |
| ) | |
| **NISSAN NORTH AMERICA, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ——————————————— ) | |
| ) | |
| **WILLIE EDMONDSON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ONSITE SOUTH, LLC,** ) | |
| ) | |
| **Defendant.** ) | |
| ——————————————— ) | |
| ) | |
| **ONSITE FLEET, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **NISSAN NORTH AMERICA, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

Case Number 3:22-cv-00513 arises from alleged racially discriminatory conduct targeting four Black men at their workplace. Plaintiffs Willie Edmondson ("Edmondson"), Antwan McGlory ("McGlory"), Jovan Mullins ("Mullins"), and Thomas Battle ("Battle") (collectively, "Plaintiffs") filed this action against Nissan North America, Inc. ("Nissan") for race discrimination

and retaliation in violation of the Civil Rights Act of 1991, 42 U.S.C. 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), and tortious interference with business relationships, among other claims. (Doc. No. 18 ("Complaint")). In Case No. 3:23-cv-01071, OnSite Fleet LLC ("Onsite") filed claims against Nissan for § 1981 race discrimination and retaliation, breach of contract, and tortious interference with employment relationships. (See Case No. 3:23-cv-01071, Doc. No. 1 ("OnSite Complaint")). Nissan then filed counterclaims against OnSite for declaratory judgment and breach of contract. (See Case No. 3:23-cv-01071, Doc. No. 10 ("Nissan Counterclaims")). The Court consolidated Case No. 3:23-cv-01071 with the instant case.[1] (See Case No. 3:23-cv-01071, Doc. No 23).

Now before the Court are the parties' cross-motions for summary judgment (Doc. Nos. 82, 113, 117, 121, 124) ("Motions"), which have all been excessively briefed and are ripe for review (see Doc. Nos. 82–84, 94–95, 107, 113–15, 117–19, 121–26, 136–39, 141–42, 144–45, 154, 156–59).[2] Nissan's Motion for Summary Judgment on Onsite's Claims and its counterclaims (Doc. No. 113) and Plaintiffs' claims (Doc. No. 117) will each be granted in part. The Court will reserve ruling on Nissan's Motion for Summary Judgment on its counterclaims (Doc. No. 113) and OnSite's Motion for Summary Judgment on Nissan's claims (Doc. No. 121) regarding Nissan's

---

[1] The Court also consolidated Case No. 3:22-cv-01010, Plaintiffs' action against OnSite, with the instant case. (Case No. 3:22-cv-01010; Doc. No. 28).

[2] The Court notes that, despite granting the parties a great deal of leniency with expanded page limitations, all parties still failed to comply with the federal rules, local rules, and the Court's Judicial Preferences in their filings. The Court need not provide a list of examples; there are too many. As a discretionary matter, the Court will consider all arguments the parties have presented, regardless of their timeliness or whether they were properly briefed. However, the parties and their counsel shall ensure that all future filings comply with the applicable federal rules, local rules, and the Court's Judicial Preferences, and are cautioned that future noncompliant filings will be stricken and may subject them to sanctions.

declaratory judgment claim pending further briefing from the parties. Because there are otherwise obvious disputes of material fact, the Motions are otherwise denied.

## I.    BACKGROUND

The parties have presented hundreds of pages of repetitive briefing in support of their motions for summary judgment, largely over one simple controlling event: the circumstances surrounding Nissan revoking Plaintiffs' access to its facilities. (Doc. Nos. 83, 94–95, 107, 114, 118, 122, 125, 136–37, 139, 141–42, 144–45, 156–59).[3] While not apparent from the parties' briefing, the basic facts surrounding this event are relatively straightforward for the purposes of summary judgment. Here, the Court will do what the parties could not—discuss only the disputed and undisputed material facts necessary to resolve the Motions before it. As the parties prepare for their jury trial, they could benefit from the quote "less is more."[4]

1.    <u>Undisputed Facts</u>[5]

Plaintiffs began working at OnSite from 2014 to 2016 as at-will employees. (Doc. No. 18 ¶¶ 16–19; Doc. No. 95 ¶¶ 6–7; Doc. No. 116-29 at 1–2; Doc. No. 137 ¶ 3; Doc. No. 145 at 3 ¶ 6).[6]

---

[3] The Court has no duty to "sift through the record in search of evidence to support" the parties' respective positions. <u>Parsons v. FedEx Corp.</u>, 360 F. App'x 652, 646 (6th Cir. 2010). However, the Court will address the facts surrounding the Motions together in making its ruling. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[4] Ludwig Mies ran der Rohe, an American architect, academic, and interior designer contributed to modern architecture by emphasizing open space and industrial materials used in construction. Paul Galloway, <u>Ludwig Mies van der Rohe: American, born Germany. 1886–1969.</u>, Museum of Modern Art, https://www.moma.org/artists/7166 (last visited October 28, 2024).

[5] These undisputed facts are drawn from the parties' statements of facts (Doc. Nos. 95, 137, 139, 142, 145, 157), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaint, OnSite Complaint and Nissan Counterclaims that are not contradicted by the evidence in the record.

[6] OnSite's Response to Nissan's Statement of Undisputed Material Facts & Statement of Additional Material Facts (Doc. No. 145) contains duplicative paragraph numbers. The Court will

3

Prior to hiring Edmondson, Battle, and McGlory, OnSite conducted background investigations on them that revealed they each had drug-related felony convictions. (Doc. Nos. 120-9, 120-10, 120-11; Doc. No. 137 ¶¶ 9–10; Doc. No. 142 ¶ 2; Doc. No. 145 at 4 ¶ 10).

In August 2018, Nissan and OnSite entered into the Professional Services Agreement ("PSA"), wherein OnSite agreed to provide contractor services for Nissan, including at Nissan's Smyrna facility, until September 30, 2021. (Doc. No. 143-1 at 2). Section 5.2 of the PSA contains a provision delineating restrictions on who OnSite may hire as employees to perform such services, stating:

> [OnSite] agrees that all employees and authorized contractors with access to [Nissan] facilities, NNA Data or the NNA Network will, prior to performing Services hereunder, have undergone background investigations, including education, Social Security number verification, employment, and criminal checks as deemed reasonably necessary by [Nissan] and in accordance with [OnSite's] standard screening practices. [Nissan] will have the right to require [OnSite] to certify in writing that any and all such individuals meet these criteria. <u>In no event shall [OnSite] use to perform the Services any individual whose background investigation has disclosed</u> an invalid Social Security number, illegal immigration status, or a <u>felony conviction</u> or pending proceedings <u>related to a criminal offense involving dishonesty, breach of trust, money laundering or violence.</u>

(<u>Id.</u> at 5) (emphasis added). Despite Edmondson's, Battle's, and McGlory's felony convictions, OnSite used them, as well as Mullins, to perform services under the PSA at Nissan's Smyrna facility. (Doc. No. 18 ¶¶ 8, 11, 21; Doc. No. 95 ¶¶ 10–13; Doc. No. 137 ¶ 11; Doc. No. 139 ¶¶ 8–11; Doc. No. 145 at 4 ¶ 11; Doc. No. 157 ¶ 1). Nevertheless, in July 2021, Nissan amended the PSA to extend its terms until September 20, 2023. (Doc. No. 127-10).

In August 2021, former OnSite employee Kimberly Warren emailed a complaint to Nissan Corporate Vehicles Senior Manager Mike Brown ("August 2021 Complaint") describing issues

---

refer to the page number of the relevant paragraph before the paragraph number when citing to this document.

she had while working at OnSite. (Doc. No. 18 ¶ 24; Doc. No. 140-13). The August 2021 Complaint states: "[w]e have three managers that sit in a van all day in the back parking lot and earn a salary, when they do absolutely nothing ([n]ot to mention these three are also listed on the TN department of corrections website as convicted felons as well[).]" (Doc. No. 140-13 at 2). Mike Brown forwarded the August 2021 Complaint to OnSite executives "for awareness" and "suggest[ed] looking into the[] allegations[.]" (Id. at 1). OnSite, upon evaluating the August 2021 Complaint, determined Warren's concerns were unfounded and unsubstantiated. (Doc. No. 95 ¶ 38). OnSite explained this to Brown. (Id. ¶ 38). Nissan did not conduct an independent investigation of the allegations in the August 2021 Complaint, nor did it request replacements, drug screenings, or background checks of any OnSite employees. (Id. ¶¶ 39–40).

On September 3, 2021, Nissan received another complaint about work at OnSite from a (then) anonymous caller ("September 2021 Complaint"). (Doc. No. 84-16; Doc. No. 95 ¶ 41). The complainant is now known to be former OnSite employee Julia Castro. (Doc. No. 95 ¶ 42). Nissan's records of the September 2021 Complaint indicate Castro complained of "workplace violence/threats/sabotage" that occurred at OnSite. (Doc. No. 84-16 at 1–2). The records states:

> Several incidents have been occurring which are frightening several employees. Many employees decided to hand in their notice as their issues are not being addressed since there is no local HR department.
>
> There are rumours that guns and drugs have been found inside the facilities; there are also rumours that some employees are selling drugs. The caller knows for a fact that "cop killers' munitions" were found, so there is a good chance that the previous rumours are accurate.
>
> Willie [Edmondson] is considered by many as the main person responsible for several of these issues.
>
> Willie [Edmondson] is abusive when he speaks to employees; Willie [Edmondson] shouts at employees and discriminates against them for being females or non-African Americans.

5

The caller was directly threatened by Willie [Edmondson]. The caller is afraid of providing detailed information. Willie [Edmondson] has access to the employees' private information, including their residences.

The caller would like to speak directly with someone; however, he/she is afraid for his/her life if Willie [Edmondson] becomes aware of this complaint.

(Id. at 2). The records of the September 2021 Complaint do not identify any allegations made against Battle, McGlory, or Mullins. (Id.). The records further note that "[t]he call was disconnected before the caller was able to confirm all the information." (Id.).

The records of the September 2021 Complaint also detail the actions that followed Castro's call. (Id. at 4). The same day Castro made the September 2021 Complaint, Nissan employee Brian Fazenbaker "[n]otified Mark Jackson, [Manager of] Security & Fire Protection, NNA-Smyrna of the report via text and telephone." (Id.). Jackson responded that he would "notify Steve Hovsepian, [the Senior Manager of Corporate Security for Nissan,] of the same and address the matter going forward." (Id.; Doc. No. 95 ¶ 56). The records of the September 2021 Complaint show that on September 13, 2021, Hovsepian logged a case note that "Mike Brown with Nissan CV has been notified that this case needs to be investigated by On-Site. The case details were provided for On-Site. They are to report back to [Nissan] on 9/27/21." (Doc. No. 84-16 at 4). However, Brown did not provide OnSite the case details (Doc. No. 85-2 at 182:23–183:1), nor did he inform OnSite that it was to report back to Nissan by September 27 (Id. at 183:6–11).

Meanwhile, Nissan formed a committee, independent from OnSite, to investigate the September 2021 Complaint. (Doc. No. 84-8 at 23; Doc. No. 85-2 at 191:22–193:15; Doc. No. 95 ¶¶ 72, 75; Doc. No. 116-17 at 192:1–193:21; Doc. No. 116-19 at 77:9–78:24). The members of the committee included Nissan employees: Greg Baker (Director of Security), Melissa Coulson (Human Resources Director), Lauren Herald (Senior Manager, Human Resources), Mark Bartleson (Chief Compliance Officer and Director of Corporate Vehicles), Mike Brown, and

Glenn Plosa (Senior Counsel). (Doc. No. 85-2 at 191:22–193:15). Between September 13, 2021 and September 17, 2021, Brown and other Nissan agents emailed each other about the "anonymous complaint," "Nissan's rights under the PSA," and "Nissan's revocation of access." (Doc. No. 84-18 at 2, 12, 21–25).

On September 17, Hovsepian conducted witness interviews. (Doc. No. 84-16 at 4). The Nissan records on the September 2021 Complaint indicate that Hovsepian spoke with the complainant, Castro, who said "Willie Edmon[d]son never threatened her, but did tell her 'I will fix you.'" (Id.). The records also state Castro "ha[d] never seen drugs or guns inside the Smyrna CV center[.]" (Id.). The records of the September 2021 Complaint show Hovsepian also spoke with two other OnSite employees, Jerry Melkin and Scott Miliner, who both confirmed they had never seen guns or drugs in the Smyrna CV center. (Id.).

On September 17, 2021, Lauren Herald interviewed Ron Katz of Nissan Corporate Vehicles. (Doc. No. 84-19; Doc. No. 95 ¶ 98). The September 17, 2021 interview notes reveal Herald only asked for "recent observations" regarding Edmondson, but not Battle, McGlory, or Mullins. (Doc. No. 84-19). The notes also reflect Katz confirmed Castro's recollection that Edmondson told her that he "will fix her" and that employees "have come [in] many times reporting that he upset them in the way he talks down to them." (Id.). The notes further state that Katz had "heard of drug dealing taking place, but ha[d] never witnessed it." (Id.). He had also "heard of guns on the property." (Id.). The notes do not name any individual associated with the drug dealing or gun allegations. (Id.). Nissan agents did not interview Plaintiffs as part of the investigation into the September 2021 Complaint. (Doc. No. 84-8 at 54).

The same day that Herald and Hovsepian conducted their interviews, Mike Brown emailed OnSite President, Trent Conrad, and OnSite Director of Production, Chris Black (Doc. No. 18 ¶

7

45), notifying them that "effective immediately, the following [OnSite] individuals are no longer permitted to enter onto Nissan property: 1. Willie Edmondson[;] 2. Jovan Mullins[;] 3. Thomas Battle[; and] 4. Antwan Mc[G]lory." (Doc. No. 84-21). Brown's email further states:

> This notice is given pursuant to Section 5.1 of our contract. We have conducted an internal review of [OnSite] at Nissan's Smyrna Corporate Vehicle facility after having received complaints. As a result we have reasonably determined that these individuals are not adequately performing contract services and have elected to exercise the specified rights under our contract.

(Id.).

But Section 5.1 of the PSA actually reads:

> The personnel provided by [OnSite] will have appropriate technical, application and other skills, including, where they exist, professional degrees, licenses or certifications, necessary to enable them to perform their duties under this Agreement. If (i) any licenses, memberships or certifications of [OnSite's] personnel lapse or are otherwise cancelled or terminated, or (ii) [Nissan] reasonably determines that any personnel provided by [OnSite] are not adequately performing Services, [Nissan] may request a replacement and [OnSite] shall replace such person as promptly as is practicable. If [OnSite] is unable to promptly provide a replacement acceptable to [Nissan], [Nissan] may, in its sole discretion, terminate this Agreement without any further liability to [OnSite] except as specified in Section 8.

(Doc. No. 143-1 at 5) (emphasis added). OnSite was "notified [of the September 2021 Complaint] slightly before the [revocation] email was sent." (Doc. No. 85-2 at 182:4–12). Nissan never requested that OnSite replace Plaintiffs prior to revoking their access to Nissan property. (Doc. No. 95 ¶ 131).

Six days later, on September 23, 2023, OnSite President Trent Conrad emailed Mike Brown about the four "employees of O[n]Site Fleet [that] were not longer permitted to enter onto Nissan property." (Doc. No. 127-7 at 1). In that email, Conrad states:

> 1. I initially asked for more detail because each of these 4 individuals is African-American, and O[n]Site Fleet needs to do its due diligence to ensure that you, on Nissan's behalf, have not considered race in denying the access for these individuals. I am more concerned given the passage of time since my initial request and given that you claimed you did not have to explain your

8

instructions, which I respectfully disagree with. Also, I am aware that a former employee, who may be the source of complaints about these individuals, in the past had expressed troubling racist attitudes. Thus, if that is the person upon whom you relied in making decisions to deny these employees' access, your decision – while innocent on its face – could be tainted with her inappropriate views. Thus, please provide me with more detail on any complaints, findings and determinations that support your instruction and your decision to deny access to these ONSite Fleet employees.

2. As I also explained, to the extent that you received complaints about O[n]Site Fleet employees, the proper protocol was to alert our management team and/or HR resource, in writing, with information about such complaints so that we could immediately investigate. It is my understanding that Nissan wishes to maintain our employees' status as contractors, employed by O[n]Site Fleet, and I am concerned that your actions here could jeopardize that status given that you appear to have handled the matter directly with O[n]Site Fleet employees rather than handling it through On[S]ite Fleet.

(Id. at 2). Brown responded, letting Conrad know he would "have our counsel reach out to yours."

(Id. at 1).

On December 1, 2021, Nissan informed OnSite that it was terminating the CV services portion of the PSA as of January 31, 2022. (Doc. No. 116-25). Nissan's Notice of Partial Termination states OnSite breached the PSA when:

OnSite's employees and/or independent contractors willfully and unlawfully used login credentials granted by the Texas Department of Public Safety to an ex-employee of OnSite in order to issue Vehicle Inspection Reports for Nissan and Infiniti vehicles resulting in numerous apparent violations of [] Texas Administrative Code. OnSite very clearly understood the legal requirement to have a certified and properly endorsed vehicle inspector on site, as by your own admission your agents tried and failed on at least four occasions to become certified.

(Id. at 1). On December 6, 2021, OnSite terminated Plaintiffs' employment, stating:

We regret to inform you that Nissan North America (NNA and NMAC) has notified O[n]Site Fleet, LLC that they have closed their investigation regarding their allegations and Nissan has determined there is no reason for them to investigat[e] or take action on their part. Unfortunately, due to Nissan's previous instruction on September 17, 2021 that you are not allowed on the premises of the Smyrna, TN location and their determination, ONSite Fleet must terminate your employment on December 15, 2021 due to lack of available positions.

9

(Doc. No. 143-4 at 1).

       2. <u>Disputed Facts</u>

As the parties' exhaustive briefing demonstrates, factual issues abound in this case. The Court has identified four main disputes of material fact that the Court finds are the touchstones to the resolution of the Motions. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). Rather than address them separately for each motion, the Court will expound on them once for reference here.

First, there is a genuine dispute of substantial fact between the parties on the correct interpretation of Section 5.2. (See Doc. No. 94 at 34; Doc. No. 107 at 8–10; Doc. No. 159 at 4). Despite the parties' necessary agreement of the existence of Section 5.2 in the PSA and that OnSite hired Edmondson, Battle, and McGlory despite their felony convictions, see supra, Section I.1, the parties critically dispute its application here in two ways. First, the parties dispute whether Section 5.2 applies to Edmondson, Battle, and McGlory given their felony convictions were all for drug related crimes. (See Doc. No. 94 at 3–4; Doc. No. 107 at 8–10; Doc. No. 159 at 4). Second, and most importantly for summary judgment, there is a genuine dispute about whether Nissan's actions altered this contractual provision, given their inaction after receiving the August 2021 Complaint that OnSite had hired convicted felons (Doc. No. 95 ¶ 39), and Nissan's admission from its attorneys stating the bar on hiring felony employees is not absolute. (Doc. No. 107-1 at 1 (Nissan Legal, in addressing whether OnSite could hire a convicted felon, responding that OnSite "should evaluate the legal risk in not hiring the employee with the legal risk of hiring the employee"); Doc.

10

No. 107-2 at 1 (Nissan Legal noting that OnSite could hire a convicted felon "if the background check didn't turn up anything new")).

Second, there is a genuine dispute of material fact on what motivated Nissan to revoke Plaintiffs' access to its facilities—the race of Plaintiffs', or something else. (See Doc. No. 137 ¶ 28; Doc. No. 139 at 9 ¶ 40). In fact, while the parties spend pages discussing Nissan's decision to revoke Plaintiffs' facility access (See, e.g., Doc. No. 83 at 11–14, Doc. No. 125 at 7–8, Doc. No. 138 at 3–7), what is absent from the briefing is why Nissan deemed Plaintiffs to "not [be] adequately performing contract services." (Doc. No. 84-21; see also Doc. No. 138 at 7 (Nissan asserting Plaintiffs "were not adequately performing services" as its reason for terminating Plaintiffs' facility access, without any citation); see generally Doc. Nos. 95, 137, 139, 142, 145, 157). There is conflicting evidence on this point such that there is a genuine dispute at issue. Plaintiffs and OnSite present evidence that could lead a reasonable juror to conclude Nissan revoking Plaintiffs' facility access was racially motivated, including: instances of racial animus (Doc. No. 85-6 at 71:1–16; Doc. No. 85-7 at 64:3–70:3; Doc. No. 85-8 at 69:20–70:12; Doc. No. 85-9 at 81:3–24); and the Nissan records of the September 2021 Complaint, which do not contain references Battle, McGlory and Mullins by name, nor does it discuss their performances at work. (Doc. No. 84-16). Meanwhile, Nissan points to evidence that could lead a reasonable juror to conclude Plaintiffs were inadequately performing at work, such as: testimony indicating Battle, McGlory, and Mullins would spend time in a van during work hours (Doc. No. 140-15 at 105:22–108:22); the records of the September 2021 Complaint indicating Edmondson had been shouting at and "abusing" employees (Doc. No. 84-16 at 1–2); and the September 2021 Complaint complainant, Castro, stating that Edmondson told her: "I will fix you." (Id. at 4).

Third, there is a genuine dispute of material fact on whether Nissan's decision to independently investigate the September 2021 Complaint and then revoke Plaintiffs' facility access outside of the specific terms of the PSA, or if it did so pursuant to the terms of Section 5.1 of the PSA. Nissan asserts it did not have to abide by Section 5.1 in revoking Plaintiffs' facility access. (See, e.g., Doc. No. 95 ¶¶ 129–30 (Nissan emphasizing that Nissan may request a replacement); id. ¶ 131 (Nissan contending "[a]s noted in the plain language [of] Section 5.1 of the PSA, Nissan was not obligated to request a replacement.")). However, it also presents evidence that it did so pursuant to Section 5.1, because Brown's email revoking Plaintiffs' access stated it was done pursuant to Section 5.1. (Doc. No. 84-21). Plaintiffs and OnSite present evidence Nissan's revocation email was false, given it acted without telling OnSite about its investigation until the day it revoked Plaintiffs' access (Doc. No. 85-2 at 182:4–12) and never requested Plaintiffs be replaced (Doc. No. 95 ¶ 131). What is not apparent from the parties' briefing or the evidence presented is why Nissan chose to terminate Plaintiffs' access to its property, rather than requesting OnSite replace them. (See generally Doc. Nos. 95, 137, 139, 142, 145, 157).

Fourth, there is a dispute of material fact regarding why Nissan terminated the CV services portion of the PSA with OnSite. While OnSite contends Nissan partially terminated the PSA due to OnSite complaining about Nissan revoking Plaintiffs' facility access (Doc. No. 116-23; Doc. No. 127-7 at 1; see supra, Section I.1), Nissan contends other evidence indicates Nissan partially terminated the PSA due to OnSite's performance issues (Doc. No. 140-25; see supra, Section I.1). Based on this evidence before the Court, a reasonable juror could find for either party.

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return

12

a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson, 477 U.S. at 249). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). "And where, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" McKay v. Federspiel, 823 F.3d 862, 866 (6th Cir. 2016) (quoting Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

13

III.    **ANALYSIS**

Given the various cross-motions for summary judgment at issue, the Court will address the parties' arguments by claim, below.  (See Doc. Nos. 83, 114, 118, 122, 125).

1.    PLAINTIFFS' CLAIMS AGAINST NISSAN

Plaintiffs have moved for summary judgment on their tortious interference with business relationships claim.[7]  (Doc. No. 83; Doc. No. 107 at 10).  Nissan has moved for summary judgment on Plaintiffs' § 1981 and Title VII race discrimination and retaliation claims, as well as Plaintiffs' tortious interference claim.  (Doc. No. 83; Doc. No. 107 at 10; Doc. No. 118).

A.    Tortious Interference

Plaintiffs allege Nissan tortiously interfered with their business relationships with OnSite when it revoked Plaintiffs' facility access.  (Doc. No. 18 ¶¶ 164–70). To establish their tortious interference with business relationships claim, Plaintiffs must show: "(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) [Nissan's] knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) [Nissan's] intent to cause the breach or termination of the business relationship; (4) [Nissan's] improper motive or improper means. . . and finally, (5) damages resulting from the tortious interference."  Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002) (internal citation and emphasis omitted).  The parties agree that Tennessee law governs this claim.  (Doc. No. 83 at 1; Doc. No. 94 at 8–9).

---

[7] Plaintiffs initially moved for summary judgment on their race discrimination and retaliation claims under § 1981 and Title VII. (Doc. No. 83).  However, because Plaintiff abandons its motion with respect to its § 1981 and Title VII claims, the Court need only address the tortious interference claim with respect to Plaintiffs' motion here.  (Doc. No. 107 at 10 ("Plaintiffs['] Motion for Summary Judgment on the tortious interference claim should be granted.  Defendant raises issues of fact that will be disputed regarding the *prima facie* case for the Title VII and Section 1981 claims[.]")).

14

i. <u>Plaintiffs' Motion</u>

As the moving party, it is Plaintiffs' burden to demonstrate the absence of a genuine dispute of material fact on all elements of their tortious interference claim to entitle them to summary judgment. <u>Rodgers</u>, 344 F.3d at 595. Whether Plaintiffs can establish the first three elements for the purposes of summary judgment is of no import, because looking at the facts in the light most favorable to Nissan, there is a genuine dispute of material fact on whether Nissan used improper means in interfering with Plaintiffs' and OnSite's business relationships when it revoked Plaintiffs' facility access.[8] <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.

"[A] determination of whether a defendant acted 'improperly'" is "dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term 'improper' is neither possible nor helpful." <u>Trau-Med</u>, 71 S.W.3d at 701 n.5. However, helpful Tennessee guidance on the issue has identified the following means as improper:

> those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules, []; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship,[]; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition[.]

<u>Id.</u> (internal citations omitted). Plaintiffs contend Nissan acted with improper means in four ways: "illegal breach of contract; undue influence; misrepresentations of contract and fact; and unethical conduct in violation of standards and established protocols between OnSite and Nissan." (Doc.

---

[8] Because Plaintiffs assert Nissan had only improper means in interfering with their relationships with OnSite, not improper motive, the Court need only address that issue here. (Doc. No. 83 at 21 n.12).

15

No. 83 at 22). However, all of these arguments fail because of the genuine disputes of fact regarding Nissan's motivations for revoking Plaintiffs' facility access and for not using the agreed upon replacement procedures under Section 5.1 of the PSA.[9] See supra, Sections I.1 and I.2.

For example, Plaintiffs cannot show there is no genuine dispute of material fact that Nissan breached the PSA. There is a dispute between the parties on whether the PSA required Nissan to use the replacement procedures under Section 5.1 of the PSA, or if it could revoke access on its own pursuant to that section. (Doc. No. 95 ¶¶ 129–30; see supra, Sections I.1 and I.2). Relatedly, and most relevant here, there are genuine disputes of material fact between the parties about Nissan's conduct under Section 5.1 of the PSA that impact the breach analysis here. See supra, Sections I.1 and I.2. Similarly, Plaintiffs' assertion that Nissan made unethical misrepresentations about why it revoked Plaintiffs' access implicates the motive behind Nissan's decision to revoke Plaintiffs' facility access. Nissan's motive is disputed between the parties. See supra, Section I.2. Finally, Plaintiffs' argument that Nissan breached established protocols between the parties suffers the same fate. Assuming that the supposed protocol for handling complaints about OnSite employees is a material fact, and the Court is not convinced it is, whether such protocol ever existed is heavily disputed. (Doc. No. 95 ¶¶ 29–30). Accordingly, drawing all reasonable inferences in Nissan's favor, Plaintiffs cannot establish that there is no genuine dispute of material fact that Nissan acted with improper means in interfering with Plaintiffs' and OnSite's business relationships. McKay, 823 F.3d at 866. Plaintiff's motion will be denied.

---

[9] The Court will not address Plaintiffs' argument that Nissan exerted undue influence, given they only address this argument in a portion of one sentence of their brief. (Doc. No. 83 at 22).

16

ii.    Nissan's Motion

Shifting to Nissan's motion, as the moving party, it is now Nissan's burden to demonstrate that it is entitled to summary judgment. Rodgers, 344 F.3d at 595. The Court understands Nissan to argue the first two elements of Plaintiffs' tortious interference claim together, asserting that because Edmondson, Battle, and McGlory had felony convictions, they had no right to a business relationship with OnSite.[10] (Doc. No. 118 at 9). As described above, see supra, Section I.2, there are genuine disputes of material fact surrounding the parties' conduct pursuant to Section 5.2 of the PSA such that this argument hinges on determinations of fact by a jury. Viewing the facts in the light most favorable to Edmondson, Battle, and McGlory, there is a genuine dispute of fact on the first two elements of their tortious interference claim. See Matsushita, 475 U.S. at 587.

Nissan's arguments on the third, fourth, and fifth elements fare no better. See Trau-Med, 71 S.W.3d at 701. Regarding the third element, Nissan contends that Plaintiffs have not produced any evidence showing Nissan's alleged intent to cause a breach or termination of the business relationships. (Doc. No. 118 at 9–11). However, Plaintiffs rely on the fact that Nissan knew revoking Plaintiffs' access to its facilities prevented Plaintiffs' abilities to work at Nissan facilities. (Doc. No. 85-2 at 224:1–225:5). Plaintiffs also cite to OnSite preparing Plaintiffs' Separation Notices at Nissan's direction. (Doc. No. 84-1 at 1–4 (OnSite Separation Notices to Plaintiffs stating circumstances of separation were because OnSite "was asked by client to remove from company")). Viewing these facts in the light most favorable to Plaintiffs, there is a genuine dispute on the intent element of Plaintiffs' claim.

The same is true for the fourth element. Nissan asserts there is no record evidence that it acted with improper means or motive in revoking Plaintiffs' access (Doc. No. 118 at 12–13), but

---

[10] In doing so, Nissan concedes these two factors on Mullins's claim. (Doc. No. 118 at 9–10).

17

Plaintiffs point to Nissan breaching the PSA's terms, violating established standards and protocols, and misrepresenting the basis for its revocation as its improper means.[11] (Doc. No. 136 at 9). Whether Nissan used improper means in revoking Plaintiffs' facility access is, again, subject to great factual dispute. See supra, Sections I.2 and III.1.A.i.

Finally, Nissan again fails to carry its burden with respect to the fifth element of Plaintiffs' tortious interference claim, damages, because it fails to address it at all. (Doc. No. 118 at 8–14). Meanwhile, Plaintiffs assert they fulfill the damages requirement through evidence of damages suffered between December 15, 2021 and January 31, 2022. (Doc. No. 136 at 5). Because genuine disputes of material fact remain on all elements of Plaintiffs' tortious interference claim, Nissan's motion will be denied on this claim.

## B. Title VII and § 1981 Race Discrimination Claims

Plaintiffs also allege Title VII and § 1981 race discrimination claims against Nissan. Plaintiffs' Title VII race discrimination claim alleges that Nissan discriminated against Plaintiffs on the basis of race when it revoked Plaintiffs' facility access. (Doc. No. 18 ¶¶ 157–63). Plaintiffs' § 1981 race discrimination claim alleges Nissan discriminated against Plaintiffs on the basis of race by interfering with their rights to make and enforce contracts and employment relationships with OnSite. (Id. ¶¶ 144–56). Nissan asserts it is entitled to summary judgment on both claims. (Doc. No. 118 at 15–26). Nissan asserts these claims fail for a myriad of reasons that fall into two categories: (1) Plaintiffs fail to show Nissan is a joint employer or that Nissan significantly affected

---

[11] Plaintiffs also assert improper motive based on evidence of racial discrimination. (Doc. No. 136 at 9). The Court need not address this issue, given there is a genuine dispute of material fact on the alleged improper means at issue.

their job opportunities, as required for their Title VII claim; and (2) Plaintiffs fail to establish their prima facie cases for racial discrimination under both Title VII and § 1981.[12]

i. Joint Employer Status Under Title VII

An entity qualifies as a joint employer under Title VII—and becomes subject to the same liability as an employer—if it "share[s] or co-determine[s] those matters governing essential terms and conditions of employment" despite the lack of a formal employer-employee relationship. See EEOC v. Skanska USA Bldg., Inc., 550 F. App'x 253, 256 (6th Cir. 2013) (citing Carrier Corp. v. NLRB, 768 F.2d 778, 781 (6th Cir. 1985)). Those essential terms and conditions include "an entity's ability to hire, fire[,] or discipline employees, affect their compensation and benefits, and direct and supervise their performance." Skanska, 550 F. App'x at 256 (internal citation omitted). This determination is made holistically by looking at the totality of the factors in the aggregate, rather than requiring satisfaction of all the factors. See Sanford v. Main St. Baptist Church Manor, Inc., 327 F. App'x 587, 594 (6th Cir. 2009).

Nissan's contention that Plaintiffs cannot show it is a joint employer is unsuccessful. It is undisputed that OnSite hired Plaintiffs. See supra, Section I.1. Still, there are genuine disputes of material fact between Plaintiffs, Nissan, and OnSite on whether Nissan disciplined Plaintiffs, had the ability to affect their compensation and benefits, and had the ability to direct and supervise their job performances. (Doc. No. 118 at 16–19; Doc. No. 136 at 17–18). First, Nissan contends its investigation and decision to revoke Plaintiffs' facility access is not discipline, citing to Roddy

---

[12] An entity that is not the plaintiff's formal employer may fall within the ambit of Title VII liability if either is plaintiff's joint employer or significantly affects access to employment opportunities. See Nethery v. Quality Care Invs., L.P., 814 F. App'x 97, 102–04 (6th Cir. 2020) (analyzing de novo whether the plaintiff offered sufficient evidence under either theory to survive summary judgment). Because Plaintiffs have offered sufficient evidence with respect to their joint employer theory to survive summary judgment, see infra, Section III.1.B.i., the Court need not address the parties' "significantly affects access" arguments.

19

v. Tennessee Dep't of Corr. in support of its position. 650 F. Supp. 3d 599, 605–06 (M.D. Tenn. 2023), appeal dismissed sub nom. Roddy v. Riverbend Maximum Sec. Inst., 2023 WL 3487058 (6th Cir. Mar. 8, 2023) (banning nurse from TDOC facility was not discipline where TDOC "had the ability to ban [the nurse] from any of its facilities"). Nissan's reliance on Roddy is unpersuasive, given the plaintiff there: (1) admitted that the TDOC did not exercise discipline over her, and (2) the TDOC undoubtedly had authority to ban plaintiff from its penal facility. Roddy, 650 F. Supp. 3d at 605–06. Neither circumstance is undisputedly present here. See supra, Section I.2. Plaintiffs have admissible evidence that Nissan's independent handling of the September 2021 Complaint, independent investigation, and exercise of authority over Plaintiffs' access in contravention to the PSA shows Nissan exercised discipline over Plaintiffs (Doc. No. 136 at 17). See supra, Section I.1. Viewing these facts in the light most favorable to Plaintiffs, there is a genuine dispute on whether Nissan's decision to revoke Plaintiffs' facility access amounted to discipline. Matsushita, 475 U.S. at 587.

Nissan's ability to impact Plaintiffs' compensation and benefits is also in dispute. Nissan contends it did not control Plaintiffs' compensation and benefits because OnSite paid Plaintiffs' salaries, wages, and benefits. (Doc. No. 96-10 at 40–47). Plaintiffs do not dispute this; instead, they assert "the revocation of access and Nissan's subsequent refusal to remove the ban proximately caused OnSite to stop paying Plaintiffs in December 2022." (Doc. No. 136 at 18). Given this, and that OnSite's Separation and Termination Notices cite to Nissan's revocation, there are genuine disputes between the parties on whether Nissan's decision revoking Plaintiffs' facility access impacted Plaintiffs' compensation and benefits. (Doc. Nos. 84-1, 143-4).

Finally, whether Nissan had the ability to direct and supervise Plaintiffs' job performance is also in dispute. Nissan contends all of Plaintiffs' supervisors were OnSite employees, and that

20

Nissan agent Mike Brown barely interacted with Plaintiffs. (Doc. No. 118 at 18). There is testimony to support this assertion, to some degree. (Doc. No. 85-6 at 71:1–2). Plaintiffs counter with admissible testimony from Plaintiffs indicating that Nissan employees were critical of OnSite employees' job performance and sometimes directed them to do tasks, such as washing and detailing cars. (Doc. No. 85-6 at 71:1–16; Doc. No. 85-7 at 64:3–70:3; Doc. No. 85-8 at 69:20–70:12; Doc. No. 85-9 at 81:3–24). Even more, Plaintiffs reply upon: an organizational chart showing Nissan employees connected in a chain of command to subordinate OnSite employees (Doc. No. 84-9); and testimony from Brown that Amanda McCabe, an OnSite employee, reported to Jennifer Murphy, a Nissan employee, for management over her day-to-day activities. (Doc. No. 85-2 at 46:1–2). Whether Nissan's or Plaintiffs' version of events controls is the job of the jury, not this Court. It is sufficient to raise a genuine dispute of material fact on whether Nissan had the ability to direct and supervise Plaintiffs as OnSite employees. Accordingly, taking all of these facts in the light most favorable to Plaintiffs, the Court finds there is a genuine dispute of material fact on whether Nissan was Plaintiffs' joint employer. See Skanska, 550 Fed. App'x at 256; Matsushita, 475 U.S. at 587.

ii. Evidence of Discrimination

In the absence of direct evidence of discrimination, a plaintiff can survive summary judgment by establishing discrimination through indirect or circumstantial evidence under the burden shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as refined by Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).[13] "Under this

---

[13] The Court acknowledges Plaintiffs' argument that Nissan waived its right to argue Plaintiffs cannot satisfy the prima facie elements of its § 1981 race discrimination claim. (Doc. No. 136 at 11–12). However, given that Nissan designated its race discrimination arguments as relating to both Plaintiffs' Title VII and § 1981 claims, the Court is not convinced. (Doc. No. 118 at 19

framework, the plaintiff must first make out a *prima facie* case of [] discrimination[.]" Rogers v. Henry Ford Health Sys., 897 F.3d 763, 772 (6th Cir. 2018). "Then, 'the burden shifts to the [defendant] to proffer a legitimate, nondiscriminatory reason for its decision.'" Id. (quoting Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009)). "If the [defendant] does so, 'the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the [defendant] were pretextual.'" Upshaw, 576 F.3d at 584. Claims of race discrimination under Title VII and § 1981 are reviewed under the same standard. Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999).

Here, Plaintiffs bear the burden under McDonnell Douglas of first showing their prima facie case of race discrimination, that: (1) they are members of a protected class; (2) they were qualified for their jobs and performed them satisfactorily; (3) despite their qualifications and performance, they suffered an adverse employment action; and (4) they were replaced by person[s] outside the protected class or were treated less favorably than similarly situated individual[s] outside of their protected class. Hughes v. Gen. Motors Corp., 212 F. App'x 497, 502 (6th Cir.

---

("Plaintiffs fail to establish a prima facie case of discrimination under Title VII or Section 1981."). Accordingly, because Nissan addresses these claims together, the Court will as well. (See id.).

Further, while both Plaintiffs and Nissan argue in their respective briefs that the indirect evidence standard applies, the Court notes there is at least some evidence in the record that may constitute direct evidence of discrimination (see, e.g., Doc. No. 85-8 at 69:20–70:12). See Erwin v. Potter, 79 F. App'x 893, 897 (6th Cir. 2003) ("Racial slurs or statements that suggest that the decision-maker relied on impermissible stereotypes to assess an employee's ability to perform can constitute direct evidence."). However, because the parties do not argue for that standard to apply here, the Court need not decide whether this is direct evidence of discrimination. Worthy v. Michigan Bell Tel. Co., 472 F. App'x 342, 346 (6th Cir. 2012) (comments are not always direct evidence of discrimination just because they are made by a supervisor). The Court will proceed according to the McDonnell Douglas burden-shifting test. 411 U.S. at 802–03.

2007) (internal quotation omitted).[14]  Nissan only argues Plaintiffs cannot establish the second and fourth elements of this test, conceding there are genuine disputes of fact on the first and third elements.[15]  (Doc. No. 118 at 20–21).

First, Nissan contends Edmondson, Battle, and McGlory cannot establish they were qualified for their positions due to their felony convictions, given Section 5.2 of the PSA prohibits OnSite from hiring individuals with felony convictions from performing contract services.  (Doc. No. 118 at 20).  Edmondson, Battle, and McGlory contend Nissan misinterprets Section 5.2, in that it does not render all individuals with felony convictions unqualified, and notes they all performed their duties at Nissan successfully for several years.  (Doc. No. 136 at 20).  As discussed above, the parties do not dispute that Edmondson, Battle, and McGlory had worked for OnSite since at least 2016, performed services under the PSA, and had drug-related felony convictions. See supra, Section I.1.  There is a genuine dispute of fact on whether Section 5.2 of the PSA includes a prohibition on drug-related felonies, particularly considering Nissan's actions relating to Section 5.2.  Id.; see supra, Section I.2.  Again, viewing those facts in the light most favorable to Edmondson, Battle, and McGlory, they have carried their burden of establishing that a

---

[14] Plaintiffs argue the facts of this case warrant a departure from these four prima facia elements given the nature of Plaintiffs' claims, as they are not against their "formal employer," OnSite. (Doc. No. 136 at 19–20).  The Court appreciates Plaintiffs' point that these elements are "not necessarily applicable in every respect to differing factual situations." McDonnell Douglas, 411 U.S. at 802.  Still, the Court does not find Plaintiffs' argument convincing, particularly considering Plaintiffs assert Nissan was their joint employer.  (Doc. No. 136 at 17).  The Court therefore declines Plaintiffs' suggestion to follow the prima facie elements of a § 1981 race discrimination claim based on unlawful interference.

[15] Nissan asserts only Edmondson, Battle, and McGlory cannot establish the second prong of the prima facie test.  (Doc. No. 118 at 20).  Accordingly, the Court will only address Mullins's claim with respect to the fourth prima facie element.

23

reasonable juror could find they were qualified for their positions at OnSite. <u>Matsushita</u>, 475 U.S. at 587; <u>Hughes</u>, 212 F. App'x at 502.

Second, Nissan asserts Plaintiffs' race discrimination claims also fail because Plaintiffs cannot establish the fourth prima facie element. While Nissan raises multiple arguments with respect to this element, the Court finds that one is dispositive—Plaintiffs are able to show a genuine dispute of fact that they were treated less favorably than similarly situated white individuals. (Doc. No. 136 at 21). In establishing that two people are similarly situated, a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir.1998) (internal quotations omitted). Instead, "the plaintiff [must] demonstrate that he or she is similarly situated to the [claimed comparator] in all relevant respects." <u>Wright v. Murray Guard</u>, 455 F.3d 702, 710 (6th Cir. 2005)(quoting <u>Ercegovich</u>, 154 F.3d at 353). In the disciplinary context, the Sixth Circuit has held that to be found similarly situated, "the plaintiff and [her] proposed comparator must have engaged in acts of 'comparable seriousness.'" <u>Clayton v. Meijer, Inc.</u>, 281 F.3d 605, 611 (6th Cir.2002). To make this assessment, a court "may look to certain factors, such as whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" <u>Wright</u>, 455 F.3d at 710 (internal citations omitted). "However, when such factors are not relevant, we need not consider them." <u>Id.</u> (internal citation omitted). "Rather, to determine whether two individuals are similarly situated with regard to discipline, courts "make an independent determination on the relevancy of a particular aspect of the plaintiff's employment

24

status and that of the [proposed comparable] employee." Id. (internal citation and quotations omitted).

To prove this element, Plaintiffs point to the cases of Paul Bush and Bobby Moss, two white employees that have had disciplinary issues with Nissan. (Doc. No. 136 at 22). In the case of Paul Bush, Nissan exercised its replacement right under Section 5.1 of the PSA when it determined Bush was not adequately performing services, but did not ban him from Nissan facilities. (Doc. No. 127-2 ¶¶ 11–13). Inadequacy in performing services is the exact reason Brown gave for Nissan terminating Plaintiffs' facility access. See supra, Section I.1. And unlike in Bush's case, Nissan did ban Plaintiffs from its facilities without asking that they be replaced. See id. To the extent Plaintiffs fail to explain further similarities between themselves and Bush, they are not so relevant here that the Court must find in Nissan's favor, given that Nissan bases its rationale for revoking Plaintiffs' facility access on the same contract provision and for the same failure to perform services. Id.; see also, Wright, 455 F.3d at 710. The Court must view these facts in the light most favorable to Plaintiffs. Matsushita, 475 U.S. at 587. In doing so, the Court finds Plaintiffs have presented evidence sufficient for a reasonable juror to conclude Nissan treated a similarly situated individual outside of Plaintiffs' class, Paul Bush, more favorably than Plaintiffs when Nissan did not ban Bush from its facilities. See Hughes, 212 F. App'x at 502.

Should that not be enough, Plaintiffs cite to Bobby Moss as a similarly situated individual, whom Nissan investigated after CV coordinators alleged he had a gun on Nissan property.[16] (Doc. No. 84-11; Doc. No. 95 ¶ 34). Nissan interviewed Moss, gave him a written disciplinary action, and did not terminate his facility access. (Doc. No. 84-12). Plaintiffs' evidence of distinct

---

[16] The Court cannot find any definitive evidence in the record that Bobby Moss is not a member of Plaintiffs' protected class. However, given Nissan does not dispute this fact, the Court infers for the purpose of summary judgment that he is not. (Doc. No. 154 at 4).

25

differences between how Moss and they were treated, Nissan not interviewing Plaintiffs during its investigation, and their facility access being terminated without disciplinary action is enough, see supra, Section I.1. (Doc. No. 95 ¶ 34).

Nissan argues that Moss and Plaintiffs had different supervisors, job titles, worked at different locations, and for different employers, and were therefore not similarly situated. (Doc. No. 118 at 25). These differences do not outweigh the relevant similarities between Moss and Plaintiffs. Moss and Plaintiffs all were investigated by the same entity, Nissan, for actions done at work on Nissan facilities, and experienced different adverse consequences pursuant to Nissan's investigations. Wright, 455 F.3d at 710. This is particularly significant given Nissan fails to present differentiating or mitigating circumstances that would distinguish Moss's and Plaintiffs' conduct, or Nissan's treatment of them for it. Id. Further, the details surrounding the employment statuses of Moss and Plaintiffs are not material; what is relevant is their respective treatments by Nissan in the face of allegations of misconduct. Id. Nissan attempts to rely on allegations of guns and drugs on the property, presumably indicating inadequate performance, to revoke Plaintiffs' facility access (see Doc. No. 84-21). See supra, Section I.1. Such disparate treatment between Plaintiffs and Moss is stark, given the seriousness of the allegations brought against Moss contrasted with the rationale Nissan gave for terminating Plaintiffs' access. Wright, 455 F.3d at 710. Viewing these facts in Plaintiffs' favor, the Court finds that a reasonable juror could find that Nissan treated Moss, who is not a member of Plaintiffs' protected class, more favorably than Plaintiffs in the context of the disciplinary issues at hand. See Hughes, 212 F. App'x at 502. Nissan's motion on Plaintiffs' Title VII and § 1981 race discriminations claim will be denied.

26

## C.  Title VII & § 1981 Retaliation

Plaintiffs assert Nissan retaliated against them by revoking their facility access, in violation of Title VII and § 1981.[17]  (Doc. No. 18 ¶¶ 144–63).  As an initial matter, "[t]he elements of a retaliation claim under § 1981 are the same as those under Title VII."  Boxill v. O'Grady, 935 F.3d 510, 520 (6th Cir. 2019).[18]  A Title VII retaliation claim can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation."  Imwalle v. Reliance Medical Products, Inc., 515 F.3d 531, 538 (6th Cir. 2008).  Nissan contends it is entitled to summary judgment on Plaintiffs' retaliation claims because Plaintiffs cannot show they engaged in a protected activity.[19]  (Doc. No. 118 at 27).  Plaintiffs contend they engaged in a protected activity by complaining to OnSite and Nissan about Nissan's discrimination.  (Doc. No. 136 at 24).  Here, Plaintiffs offer circumstantial evidence of retaliation under the burden-shifting framework of McDonnell Douglas.

Plaintiffs bear the initial burden to establish a prima facie case of retaliation.  Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014).  To establish a prima facie case of retaliation, Plaintiffs must show: "(1) [they] engaged in activity protected by Title VII; (2) [] exercise of such protected activity was known by [Nissan]; (3) thereafter, [Nissan] took an action that was "materially adverse" to [Plaintiffs]; and (4) a causal connection existed between the protected

---

[17] The Court is not convinced Plaintiffs have alleged a retaliation claim under Title VII.  (See Doc. No. 18 ¶¶ 158–63 (not alleging Nissan retaliated against Plaintiffs under Title VII)).  Still, given the Court's conclusion here, see infra, Section III.1.C, and that the parties have not raised this issue, the Court need not consider this here.

[18] Accordingly, where the Court refers to Plaintiffs' Title VII retaliation claim, the same applies to its § 1981 retaliation claim.

[19] Nissan asserts Plaintiffs' retaliation claims fail for other reasons.  (Doc. No. 118 at 27–30).  Because the protected activity issue is dispositive, the Court need not address those issues here.

27

activity and the materially adverse action." Jones v. Johanns, 264 F. App'x. 463, 466 (6th Cir. 2007) (internal citations omitted). If Plaintiffs succeed in making out their prima facie case, "the burden of production of evidence shifts to [Nissan] to articulate some legitimate, non-discriminatory reason for its actions." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007) (internal quotations and citations omitted). If Nissan satisfies its burden of production, the burden shifts back to Plaintiffs to demonstrate that Nissan's proffered reason was not the true reason for the employment decision. Id. (internal quotations and citations omitted).

Here, the Court agrees with Nissan that the record lacks evidence that Plaintiffs engaged in protected activities that could plausibly form the basis for their retaliation claims. Despite Plaintiffs asserting they "performed multiple protected activities that Nissan knew about," they provide no citation showing that "Plaintiffs complained to OnSite about Nissan's discrimination." (Doc. No. 136 at 24). Nor can the Court find any such evidence of this in the record. Further, the only specific example Plaintiffs point to as a protected activity is that "Edmondson called Nissan HR to complain about Brown's racist comments and disparate treatment in October 2021." (Id.). Even taking this as true, despite no evidence in the record confirming this, this is insufficient to show a protected activity for two reasons. First, Plaintiffs allege only Edmondson participated in this activity—not Battle, McGlory, or Mullins. Second, and most importantly, even if Plaintiffs produced evidence showing all four of them participated in this call, it cannot constitute the protected activity they base their retaliation claims on because the complaint happened after Nissan took its alleged retaliatory action in September 2021 when it denied Plaintiffs' facility access. A retaliation claim is rooted in the premise that the defendant takes a materially adverse action against a plaintiff because of the protected activity. Jones, 264 Fed. App'x at 466 (materially adverse action occurs after plaintiff engages in a protected activity and defendant becomes aware

28

of it).  To assert a retaliation claim based only on events happening after that adverse action is oxymoronic.  Accordingly, Nissan's motion will be granted on Plaintiffs' Title VII and § 1981 retaliation claims.

## 2. ONSITE'S CLAIMS AGAINST NISSAN

OnSite and Nissan have filed cross-motions relating to all of OnSite's claims against Nissan.  (Doc. Nos. 114, 125).  The Court will address these claims below.

### A. § 1981 Race Discrimination

OnSite alleges that when Nissan discriminated against Plaintiffs under the basis of race by revoking their facility access, it violated OnSite's rights under § 1981.  (Case No. 3:23-cv-01071, Doc. No. 1 ¶¶ 61–68).  Nissan argues it is entitled to summary judgment on OnSite's race discrimination claim for two reasons: (1) OnSite does not have standing to assert a race discrimination claim; and (2) OnSite's claim fails on the merits.  (Doc. No. 114 at 9).  Onsite has filed a cross-motion for summary judgment on its § 1981 race discrimination claim, asserting it is entitled to summary judgment on that claim because there are no genuine disputes of material fact that Nissan discriminated against it.  (Doc. No. 125 at 14).  The Court will first address the standing issue, and then will turn to the merits.

#### i. Standing

"[T]he irreducible constitutional minimum of standing contains three elements."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (internal citations omitted).  "The party invoking federal jurisdiction bears the burden of establishing these elements[,]" Lujan, 504 U.S. at 561, and a plaintiff invoking

jurisdiction must "show[ ] that he has standing for each type of relief sought[,]" <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 493 (2009). Moreover, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, <u>i.e.</u>, with the manner and degree of evidence required at the successive stages of the litigation." <u>Lujan</u>, 504 U.S. at 561. This means that, "in response to a summary judgment motion," a plaintiff cannot rely on "mere allegations" with respect to each standing element, "but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." <u>McKay</u>, 823 F.3d at 867 (citing <u>Lujan</u>, 504 U.S. at 561) (internal citation omitted).

OnSite has satisfied the first element of standing, that it suffered an injury in fact. <u>Spokeo</u>, 578 U.S. at 338. As a threshold matter, OnSite's status as a corporation does not prevent it from having standing for its § 1981 discrimination claim. <u>Inner City Contracting, LLC v. Charter Township of Northville, Michigan</u>, 87 F.4th 743, 753 (6th Cir. 2023) (citing <u>Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.</u>, 368 F.3d 1053, 1060 (9th Cir. 2004) ("[I]f a corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981.")); <u>see</u> <u>Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.</u>, 295 F.3d 1065, 1072 (10th Cir. 2002) ("We agree that Africa House has standing to assert discrimination claims under § 1981 and § 1982 where such discrimination is based on the race of one of its employees"); <u>see also</u> <u>Domino's Pizza, Inc. v. McDonald</u>, 546 U.S. 470, 473 n.1 (2006) ("the Courts of Appeals [that] have considered the issue have concluded that corporations may raise § 1981 claims."). Here, Onsite has shown it has cognizable harm under § 1981, as it contends it was injured due to Nissan's discriminating against Plaintiffs, and later OnSite, on account of Plaintiffs' race. <u>Thinket</u>, 87 F.4th at 753; <u>Guides</u>, 295 F.3d at 1072.

30

As to its alleged injuries, OnSite points to various injuries it contends it suffered because of Nissan's alleged discriminatory act, its decision to revoke Plaintiffs' facility access. These harms include: loss of employees (Doc. No. 127-19 at 101:1–102:3); payment of employees who were no longer working (id. at 72:4–8); loss of the CV portion of the PSA with Nissan (Doc. No. 127-2 ¶ 8); and Plaintiffs' suit against OnSite for wrongful termination (Case No. 3:22-cv-01010, Doc. No. 1). (See Doc. No. 114 at 14–15). Taking this evidence as true, this is sufficient for OnSite to establish it suffered an injury in fact for the purposes of summary judgment. McKay, 823 F.3d at 867.

OnSite does not assist the Court in evaluating whether it has satisfied the second and third prongs of standing, Spokeo, 578 U.S. at 338, as it argues these factors in a single conclusory sentence. (See Doc. No. 144 at 15 (stating "[b]ecause these injuries are traceable to Nissan and are redressable by the Court, OnSite has standing to bring its claim"). Nevertheless, the Court must draw all justifiable inferences in OnSite's favor based on the record before it to determine whether OnSite has satisfied the second and third prongs of standing. Matsushita, 475 U.S. at 587. In doing so, the Court finds there is sufficient evidence in the record to conclude that OnSite has standing to bring its § 1981 race discrimination claim. Regarding the second prong, the record reflects that at least two of OnSite's alleged injuries, its loss of Plaintiffs as workers and Plaintiffs' subsequent suit against OnSite, are both fairly traceable to Nissan's decision to revoke Plaintiffs' facility access. See supra, Section I.1; see also Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133 (2014) (defendant's conduct need not have a "close connection" to plaintiff's injury.). On the third prong, the record shows that a favorable decision will address OnSite's injury, as OnSite succeeding on its claim would compensate it for the alleged harm Nissan caused. Whitmore v. Arkansas, 495 U.S. 149, 155 (1990). Accordingly, the Court finds that,

31

taking the facts in the light most favorable to OnSite, it has standing to bring its § 1981 race discrimination claim. See Matsushita, 475 U.S. at 587.

ii.    The Merits

Nissan next argues it is entitled to summary judgment on OnSite's race discrimination claim because OnSite cannot establish the elements of its prima facie case. (Doc. No. 114 at 11–12). On the other hand, OnSite contends there is no dispute of fact that it has established the requisite elements such that it is entitled to summary judgment. (Doc. No. 125 at 14). In order to establish a claim for racial discrimination under § 1981, OnSite must prove that "(1) [it] belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against [it] on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in [§ 1981]." Amini v. Oerlin Coll., 440 F.3d 350, 358 (6th Cir. 2006). "The second prong, regarding intentional discrimination, can be shown through either direct evidence of discrimination or circumstantial evidence 'which would support an inference of discrimination.'" Inner City Contracting, 87 F.4th at 755 (quoting Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572 (6th Cir. 2000)). Where a contractor seeks to prove its case based on circumstantial evidence, as OnSite has asserted here, it must show the prima facie factors discussed in Section III.1.B.ii, above.[20] See also TLC Realty 1 LLC v. Belfor USA Group, Inc., 166 F. Supp. 3d 919, 925 (S.D. Ohio 2016) (internal citation omitted).

---

[20] The parties dispute whether the McDonnell Douglas four-part prima facie test or the Keck v. Graham Hotel Sys., Inc. three-part test applies here. 566 F.3d 634, 639 (6th Cir. 2009) ("In determining whether a defendant's actions rise to the level of being markedly hostile, courts consider whether the conduct is: "(1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination.") (internal citation and quotations omitted). While OnSite contends Keck applies because this is a contract-related § 1981 claim, Nissan asserts the circumstances in Keck were too different to apply its test here. As Nissan notes, in Keck, the defendant was a provider of wedding reception services, but

32

a)  OnSite's Motion

OnSite contends it is entitled to summary judgment on its race discrimination claim because, in applying the Keck factors to its prima facie case, it has established all the elements under the McDonnell Douglas burden-shifting framework.  (Doc. No. 125 at 14–25).  While OnSite makes various arguments on why it is entitled to summary judgment, the only one the Court need address is its argument that Nissan prevented it from contracting with Plaintiffs or from contracting with Nissan for the CV business.  This argument is dispositive here, and could apply to either the third factor in McDonnell Douglas or Keck tests.  Regardless, OnSite's motion must be denied because there are genuine disputes of material fact on the issue of the causation element for each of these relationships deteriorating, see supra, Section I.2.  (See also Doc. No. 95 ¶ 138 (disputing whether OnSite terminated Plaintiffs in September or December 2021); Doc. No. 157 ¶¶ 16–17 (disputing Nissan's role in OnSite terminating Plaintiffs' employment)).  Accordingly, OnSite's motion will be denied on its race discrimination claim.

---

refused to contract for them with the plaintiffs on account of their race.  Keck, 566 F.3d at 636–38.  Here, the parties were already in a contractor-client relationship under the PSA at the time of Nissan's alleged discrimination.  (Doc. No. 143-1).  The Court is not aware of, and the parties do not cite to, any published Sixth Circuit precedent applying the § 1981 prima facie factors to this scenario.  Nor is the Court convinced the circumstances here are similar enough to Keck to apply it to this case, particularly given the Keck factors were developed for commercial establishment cases.  See Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 872 (6th Cir. 2001) (describing this test as applying to "commercial establishment" cases).  Accordingly, the Court will follow district courts in the Sixth Circuit that have applied the four McDonnel Douglas factors to similar circumstances as those here.  TLC, 166 F. Supp. 3d at 925 (African American owned contracting business not assigned work by defendant property restoration company for using independent contractors rather than its own employees to perform work) (internal citation omitted); see Wil's Indus. Servs., Inc. v. United States Steel Corp., 2009 WL 2169663, at * 6 (N.D. Ind. July 17, 2009) (African American owned industrial cleaning service suspended from work for safety violations) (internal citation omitted).  Still, the Court will keep in mind that the model for a prima facie case announced in McDonnell Douglas is not inflexible and can vary depending on differing factual situations.  Burdine, 450 U.S. at 254 n.6.

33

b) Nissan's Motion

Nissan argues it is entitled to summary judgment on OnSite's race discrimination claim. However, it is unclear which elements of OnSite's claim Nissan contends it cannot establish. (Doc. No. 114 at 13). Given this ambiguity, and that OnSite and Nissan disagree on the applicable legal standard at issue, see supra, Section III.2.A.ii.n.20, the Court will address each of the four prima facie elements of OnSite's claim.

OnSite has established the first element of its prima facie case, that it is a member of a protected class. As OnSite notes, there are various ways a corporation can show it is a member of a protected class. Among those, OnSite relies on Tenth Circuit precedent permitting a corporation's § 1981 race discrimination claim based on the race of one of its employees. Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc., 295 F.3d 1065, 1072 (10th Cir. 2002) (corporation had standing to assert § 1981 race discrimination claim based on the race of one of its employees). OnSite's claim is based on Nissan's allegedly racially discriminatory acts towards Plaintiffs, and subsequently OnSite, because of Plaintiffs' race. Accordingly, OnSite has established a genuine dispute of fact on whether it is a member of a protected class.

OnSite also has raised a disputed issue of material fact on the second prima facie element, whether it was qualified to perform its job as a contractor for services for Nissan. White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008). While Nissan contends OnSite had not been performing its duties under the PSA in a satisfactory manner, OnSite points to evidence that in July 2021 Nissan extended OnSite's services under the PSA for two more years (Doc. No. 127-10). See supra, Section I.1. Taking this evidence in the light most favorable to OnSite, it has established it was arguably qualified to perform the CV program services.

34

OnSite has also established a genuine dispute of material fact on the third element of its prima facie case, that it suffered an adverse action. While neither party explicitly addresses what adverse action is at issue, it is implicit in the parties' briefing that it is OnSite's right to make and enforce contracts. See Spokojny v. Hampton, 589 F. App'x 774, 777 (6th Cir. 2014) (Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors.") (internal citation omitted). OnSite further argues that Nissan deprived it of its right to contract under the PSA by conducting a separate investigation on Plaintiffs without OnSite's knowledge or involvement, and by failing to consult OnSite about Plaintiffs' alleged lack of performance. (Doc. No. 144 at 16–17). These facts are undisputed. See supra, Section I.1. OnSite contends Nissan further hindered its right to contract under the PSA, presumably in reference to Nissan terminating the CV program, when it treated OnSite differently than it did another vendor who experienced issues with its employees, QIC. (Doc. No. 144-4 ¶ 5). Nissan contends it did not improperly deny OnSite the right to make and enforce the PSA, given its revoking Plaintiffs' facility access did not impact OnSite's gross profits, and OnSite cannot show it was performing its CV program services satisfactorily. As shown above, see supra, Section I.2, the factual circumstances surrounding those arguments are disputed. Again, viewing these facts in OnSite's favor, it has satisfied its showing of the third prima facie element.

Finally, OnSite has presented evidence sufficient to raise a genuine dispute of material fact regarding the fourth element of its prima facie case, that Nissan treated it differently than a similarly situated non-protected contractor. While OnSite does not directly address this factor, based on its belief that Keck applies here, it does present evidence that Nissan treated another vendor, QIC, more favorably than it under similar circumstances. (Doc. No. 144 at 18). OnSite presents evidence showing that Nissan treated QIC more favorably than OnSite. Nissan terminated

35

its contract with QIC after several incidents with QIC employees, who threatened to shoot people and sexually assaulted another employee. (Doc. No. 144-4 ¶ 5). OnSite contends those circumstances were of a much more severe nature than the alleged incidents Nissan relies upon to justify OnSite's termination. (Id.).

Nissan argues QIC is not a similarly situated vendor because Nissan ultimately terminated its contract with QIC, and OnSite was required to point to a vendor who did not have a contract terminated with Nissan to satisfy this element.[21] (Doc. No. 156 at 2). In support of its position, Nissan cites to a non-binding district court opinion, B&S Transp., Inc. v. Bridgestone Americas Tire Operations, LLC. 171 F. Supp. 3d 669, 681 (N.D. Ohio 2016), aff'd sub nom. B & S Transportation, Inc. v. Bridgestone Americas Tire Operations, LLC, 758 F. App'x 503 (6th Cir. 2019). However, B&S does not stand for the proposition Nissan asserts here. Rather, B&S merely states the general proposition described under McDonnell Douglas that the plaintiff must show the defendant "treated similarly situated, non-minority [vendors], more favorably than it treated" the plaintiff. Id. at 681. Given this, the flexibility that the McDonnell Douglas test allows, and that OnSite's burden to establish a prima facie case is not onerous, Jackson v. FedEx Corp. Servs., Inc., 518 F.3d 388, 398 (6th Cir. 2008), the Court finds a reasonable juror could find QIC is a similarly situated vendor outside of OnSite's protected class that Nissan gave more preferential treatment. This is sufficient for OnSite to establish the fourth element of its § 1981 prima facie case. Because Nissan does not challenge OnSite's claim on any other grounds, Nissan's motion is denied with respect to this claim.

---

[21] Notably, Nissan does not argue that QIC is not a member of a protected class. (Doc. No. 156 at 2). Accordingly, viewing all facts in the light most favorable to OnSite, the Court will infer for the purposes of summary judgment that QIC is not a member of a protected class.

36

B.  § 1981 Retaliation

OnSite alleges Nissan retaliated against it for complaining about Nissan revoking Plaintiffs' facility access based on their race, in violation of § 1981.  (Case No. 3:23-cv-01071, Doc. No. 1 ¶¶ 61–68).  Nissan and OnSite filed cross-motions on this claim.  (Doc. No. 114 at 16–18; Doc. No. 125 at 27).  The legal standard for a § 1981 retaliation claim is described above.  See supra, Section III.1.C.  The Court will address OnSite's motion first.

i.    OnSite's Motion

OnSite argues it has satisfied its prima facie case for retaliation.  (Doc. No. 125 at 26–27).  The Court need not delve into each element of OnSite's claim, however, because its motion undoubtedly fails on the fourth element, the causal connection between OnSite's alleged protected activity, "[c]omplaining about racial discrimination," and the alleged adverse action, Nissan partially terminating the PSA.  Why Nissan terminated the CV services portion of the PSA is disputed.  See supra, Section I.2; see Jones, 264 Fed. App'x at 466.  Accordingly, OnSite's motion on its retaliation claim will be denied.

ii.    Nissan's Motion

Nissan asserts OnSite's retaliation claim fails for two reasons: (1) it cannot establish OnSite's alleged protected activity was the "but for" cause of Nissan's decision to partially terminate the PSA; and (2) OnSite cannot establish pretext.  Nissan's first argument fails for the same reason Onsite's motion did; there is a genuine dispute of fact between the parties on why Nissan partially terminated the PSA.  See supra, Sections I.2 and III.2.B.ii.

Nissan's second argument fails for a simpler reason—Nissan fails to carry its burden to establish a legitimate, nonretaliatory reason for partially terminating the PSA (Doc. No. 114 at 17–18).  See Dixon, 481 F.3d at 333.  In fact, Nissan skips the element entirely in its analysis.  (See

37

Doc. No. 114 at 17–18). Even if Nissan were to argue that its legitimate, nonretaliatory reason for partially terminating the PSA is the "numerous issues with OnSite's performance" (id. at 18), OnSite presents evidence addressing these issues and showing Nissan's lack of concern over such matters. (See, e.g., Doc. No. 127-2 ¶¶ 14–15; Doc. Nos. 127-5, 127-9; Doc. No. 144-3 at 127:7–19). Viewing that evidence in OnSite's favor, combined with evidence that OnSite had expressed concerns over Nissan's investigation into Plaintiffs, a reasonable juror could find that Nissan's legitimate, nonretaliatory reason for partially terminating the PSA was pretextual. See supra, Section I.1. Accordingly, Nissan's motion with respect to this claim will be denied.

### C. Breach of Contract

OnSite also alleges Nissan breached the PSA when it revoked Plaintiffs' facility access. (Case No. 3:23-cv-01071, Doc. No. 1 ¶¶ 69–77). Again, Nissan and OnSite file cross-motions on this claim. While OnSite asserts it is entitled to judgment as a matter of law on this claim (Doc. No. 125 at 27), Nissan alleges Onsite's claim fails for three reasons: (1) OnSite breached the PSA first; (2) Nissan's revocation and its partial termination of the PSA were not breaches; and (3) OnSite cannot show that any alleged breach by Nissan caused OnSite damages. (Doc. No. 114 at 18–22). The parties agree that Tennessee law governs the PSA. (See generally Doc. Nos. 114, 125, 138, 144 (citing to Tennessee contract law)). To prevail on its breach of contract claim, OnSite is required to show the existence of an enforceable contract, nonperformance amounting to the breach, and damages caused by the breach. Life Care Cntrs. of Am. Inc. v. Charles Town Assoc's. Ltd. Partnership, LPIMC, Inc., 79 F.3d 496, 514 (6th Cir. 1996); ARC LifeMed, Inc. v. AMC-Tennessee, Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

38

i.    OnSite's Motion

Looking at the facts in the light most favorable to Nissan, see Matsushita, 475 U.S. at 587, OnSite has failed to carry its burden of showing there are no genuine disputes of material fact on its contract claim. There are, at a minimum, fact issues for the jury surrounding: (1) how the parties handled the hiring and employment of individuals with felony convictions; and (2) whether, and to what extent, Nissan relied on Section 5.1 in revoking Plaintiffs' facility access. See supra, Section I.2. The jury must weigh the contradictory evidence on these issues. Accordingly, OnSite's motion will be denied on this claim.

ii.    Nissan's Motion

Turning back to Nissan's motion for summary judgment with respect to OnSite's breach of contract claim, the Court must now look at the facts in the light most favorable to OnSite. See Matsushita, 475 U.S. at 587. Nissan's first argument that it is entitled to summary judgment, because OnSite breached the PSA first, again fails for the reasons just discussed. See supra, Sections I.2 and III.2.C.i. Nissan's second argument, that Nissan's decision revoking Plaintiffs' facility access did not constitute a breach of the PSA, is again surrounded by factual disputes. See supra, Section I.2.

Nissan's argument that OnSite has not shown that any alleged breach by Nissan caused OnSite damages is a closer call. Nissan contends that OnSite has failed to show its decision revoking Plaintiffs' facility access caused OnSite harm because the only harm it could possibly allege relates to Nissan's partial termination of the PSA on December 1, 2021, not the revocation. (Doc. No. 138 at 25–26). In arguing this, Nissan points to testimony from OnSite employees that OnSite is either not seeking monetary damages, or is not aware of what those damages are. (Doc. No. 140-16 at 219:5–11; Doc. No. 140-17 at 76:24–77:18). OnSite counters with a single sentence

39

relating to causation and damages, that it "has repeatedly shown how Nissan's breach of contract meant the loss of its largest source of revenue." (Doc. No. 144 at 25). There, OnSite cites to the Declaration of Lauren Normand ("Normand Declaration") to support its position. (See Doc. No. 127-2).

The Normand Declaration contains no clear explanation linking Nissan's breach to any OnSite damages. (Id.). However, it does state that the "revenue generated under the CV portion of the [PSA] was 80 percent of Onsite's total business." (Id. ¶ 8). Onsite has again done the Court no favors in meekly arguing the causation and damage elements necessary to support its breach of contract claim. Still, viewing these facts in the light most favorable to OnSite, the Court finds there enough (albeit barely) that a jury could find Nissan's decision revoking Plaintiffs' facility access in violation of Section 5.1 led to OnSite losing 80 percent of Onsite's total business. Matsushita, 475 U.S. at 587. Further, even if the Court were to find OnSite failed to present any evidence showing a dispute of fact on its alleged compensatory damages, OnSite still may be entitled to nominal damages under Tennessee law. See Coin Automatic Co. v. Dixon's Estate, 213 Tenn. 311, 318–19 (Tenn. 1963) ("If he has sustained no damages which are the natural and proximate results of the breach, he has sustained no injury, and can only recover nominal damages.") (internal citation omitted). Accordingly, Nissan's motion will be denied respect to OnSite's contract claim.

### D. Tortious Interference with Employment Relations

OnSite further alleges Nissan tortiously interfered with its employment relationships with Plaintiffs when it revoked their facility access. (Case No. 3:23-cv-01071, Doc. No. 1 ¶¶ 78–83). Nissan argues it is entitled to summary judgment because: (1) it is time-barred; and (2) OnSite cannot establish each element of the claim. (Doc. No. 114 at 23–25). OnSite's cross-motion

argues it is entitled to summary judgment because it has established all the elements of its tortious interference claim as a matter of law. (Doc. No. 125 at 28). The Court will only address Nissan's statute of limitations argument because it is dispositive here.

The parties agree that OnSite's tortious interference claim relates to its employment relationships with Plaintiffs, which is governed by Tennessee law. (Doc. No. 114 at 23; Doc. No. 144 at 25–26). However, they dispute the applicable statute of limitations at issue. Their dispute hinges on whether Plaintiffs' at-will employments with OnSite were personal or property rights. Injuries to the person are governed by a one-year statute of limitations, Tenn. Code Ann. § 28–3–104, whereas injuries to property are governed by a three-year period, Tenn. Code Ann. § 28–3–105.

Nissan argues that OnSite's employment relationships with Plaintiffs were at-will, which constitute personal interests governed by a one-year statute of limitations period. To support its position, Nissan points to Sudberry v. Royal & Sun All. for the proposition that at-will employment relationships implicate "no property interest in future employment" such that a one-year statute of limitations applies to the tort action. 344 S.W.3d 904, 908 (Tenn. Ct. App. 2008). OnSite does not dispute its relationships with Plaintiffs were at-will. See supra, Section I.1. Nor does it dispute that it filed its tortious interference claim more than a year after its alleged injury. (Doc. No. 144 at 25–26 (not responding to Nissan's argument that it filed its claim more than a year after Nissan revoked Plaintiffs' access); see Case No. 3:23-cv-01071, Doc. No. 1 (filed on October 13, 2023)). Instead, OnSite contends that the Court should discard Sudberry, and instead find a three-year statute of limitations is applicable. (Doc. No. 144 at 25–26). Onsite argues a three-year statute of limitations is appropriate given: (1) tort claims rooted in property rights have a three-year state of

limitations; and (2) Tennessee courts typically treat at-will employment as a property right. (Doc. No. 144 at 25–26).

To determine whether a one-year or three-year statute of limitations applies to OnSite's tortious interference claim, the Court must look to "the type of injuries claimed and the damages sought." Mackey v. Judy's Foods, Inc., 867 F.2d 325, 329 (6th Cir. 1989). On October 13, 2023, OnSite filed the OnSite Complaint for tortious interference claim against Nissan. (Case No. 3:23-cv-01071, Doc. No. 1). OnSite alleges that its tortious interference claim arises from "existing employment relationships with McGlory, Mullins, Battle, and Edmondson" that was lost due to Nissan's "revoking their facility access," which occurred in September 2021. (Id. ¶¶ 80–81). OnSite alleges that because of Nissan's decision revoking Plaintiffs' facility access, it "has been and continues to be damaged." (Id. ¶ 82).

Based on these allegations, the Court agrees with Nissan that OnSite's tortious interference claim is subject to a one-year statute of limitations. OnSite's tortious interference claim is based on its injuries to its employment relationships with Plaintiffs, which it admits are at-will. (Doc. No. 145 at 3 ¶ 6; Case No. 3:23-cv-01071, Doc. No. 1 ¶¶ 80–81). The only case either party has cited to that is directly on point, Sudberry, holds that torts rooted in injuries to at-will employment relationships are personal in nature, and are therefore governed by a one-year statute of limitations period. 344 S.W.3d at 908. The only cases this Court has found on this issue are consistent with Sudberry's application of a one-year statute of limitations to claims rooted in injuries to at-will employment relationships. See Evans v. Walgreen Co., 813 F. Supp. 2d 897, 934–35 (W.D. Tenn. 2011) (applying one-year statute of limitations to misrepresentation claim rooted in plaintiff's status as an at-will employee); Parks v. Lyash, 2022 WL 20703477, at *6 (E.D. Tenn. May 17, 2022) (dismissing tort claims brought by at-will employees as untimely, given "[t]ort claims

42

limitations; and (2) Tennessee courts typically treat at-will employment as a property right. (Doc. No. 144 at 25–26).

To determine whether a one-year or three-year statute of limitations applies to OnSite's tortious interference claim, the Court must look to "the type of injuries claimed and the damages sought." Mackey v. Judy's Foods, Inc., 867 F.2d 325, 329 (6th Cir. 1989). On October 13, 2023, OnSite filed the OnSite Complaint for tortious interference claim against Nissan. (Case No. 3:23-cv-01071, Doc. No. 1). OnSite alleges that its tortious interference claim arises from "existing employment relationships with McGlory, Mullins, Battle, and Edmondson" that was lost due to Nissan's "revoking their facility access," which occurred in September 2021. (Id. ¶¶ 80–81). OnSite alleges that because of Nissan's decision revoking Plaintiffs' facility access, it "has been and continues to be damaged." (Id. ¶ 82).

Based on these allegations, the Court agrees with Nissan that OnSite's tortious interference claim is subject to a one-year statute of limitations. OnSite's tortious interference claim is based on its injuries to its employment relationships with Plaintiffs, which it admits are at-will. (Doc. No. 145 at 3 ¶ 6; Case No. 3:23-cv-01071, Doc. No. 1 ¶¶ 80–81). The only case either party has cited to that is directly on point, Sudberry, holds that torts rooted in injuries to at-will employment relationships are personal in nature, and are therefore governed by a one-year statute of limitations period. 344 S.W.3d at 908. The only cases this Court has found on this issue are consistent with Sudberry's application of a one-year statute of limitations to claims rooted in injuries to at-will employment relationships. See Evans v. Walgreen Co., 813 F. Supp. 2d 897, 934–35 (W.D. Tenn. 2011) (applying one-year statute of limitations to misrepresentation claim rooted in plaintiff's status as an at-will employee); Parks v. Lyash, 2022 WL 20703477, at *6 (E.D. Tenn. May 17, 2022) (dismissing tort claims brought by at-will employees as untimely, given "[t]ort claims

42

Case 3:22-cv-00513   Document 165   Filed 10/30/24   Page 42 of 48 PageID #: 5421

brought by at-will employees against their employers are subject to [a] one-year statute of limitations"); see also Stratton v. Wommack, 230 Fed. App'x 491, 495 n.5 (6th Cir. 2007) (noting that a claim for tortious interference with contract could be an injury to personal property subject to a one-year statute of limitations). Further, the cases OnSite points to are irrelevant, as they contain no suggestion that Sudberry is incorrect. See Forrester v. Stockstill, 869 S.W.2d 328, 330 (Tenn. 1994) (not addressing statute of limitations for an intentional interference claim brought a year after the alleged injury); Leemis v. Russell, 2000 WL 705772, at *1–4 (Tenn. Ct. App. May 24, 2000) (same).

Because the parties agree that Nissan revoked Plaintiffs' access to the facility on September 17, 2021 (Doc. No. 157 at 3 ¶ 6), and OnSite did not file its tortious interference claim until October 13, 2023 (Case No. 3:23-cv-01071, Doc. No. 1), it failed to timely file its claim. Tenn. Code Ann. § 28–3–104. Accordingly, OnSite's tortious interference claim is time-barred, and Nissan's motion will be granted with respect to this claim. Because the Court finds Nissan is entitled to judgment on this claim as a matter of law, OnSite's motion with respect to this claim is denied.

### 3. NISSAN'S CLAIMS AGAINST ONSITE

Nissan and OnSite filed cross-motions with respect to Nissan's Counterclaims. The Court will address these claims below.

#### A. Declaratory Judgment

Nissan requests declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, to determine the rights and obligations existing between the parties regarding Section 13 of the PSA. (Case No. 3:23-cv-01071, Doc. No. 10 ¶¶ 37–40). Nissan and OnSite filed cross-motions on this claim. Section 13 of the PSA provides in relevant part:

> **13. Indemnification.** Contractor shall indemnify, defend and hold Client, its officers, directors, employees, parent, subsidiaries and affiliates, harmless from and

43

against any and all claims, demands, causes of action, suits, proceedings, damages, judgment, fines, penalties, losses, liabilities, costs and expenses, including attorneys' fees and in-house counsel fees, related to, in connection with, arising from or alleged to arise from, directly or indirectly, any act or omission of Contractor, its employees agents or representatives, in providing Services hereunder, including, but not limited to, claims for personal injury, death or property damage, business or employee claims, or claims alleging that any Materials, Created Works or Services supplied by Contractor hereunder infringe the Intellectual Property Rights of any third party.

(Doc. No. 143-1 at 17). Nissan contends it is entitled to declaratory judgment that Section 13 of the PSA requires OnSite to defend Nissan against Plaintiffs' claims because their claims arise from OnSite hiring Edmondson, Battle, and McGlory, despite their felony convictions. (Doc. No. 114 at 28). OnSite asserts it is entitled to summary judgment because Section 13 of the PSA does not apply to the to the facts at issue and is void under federal law. (Doc. No. 122 at 4–5). The Court cannot yet address these issues, however, because both ignore a threshold issue with Nissan's claim—whether this Court should exercise its jurisdiction under the Declaratory Judgment Act.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Supreme Court has indicated that the Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). In passing the Act, Congress "created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." Id. at 288. District courts are afforded substantial discretion to exercise jurisdiction "in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and fitness of the case for resolution, are peculiarly within their grasp." Id. at

289. In considering whether a district court has properly exercised its discretion in this regard, the Sixth Circuit has traditionally focused on five factors:

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata";
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
> (5) whether there is an alternative remedy which is better or more effective.

Grand Trunk W. R.R. Co. v. Consol. Rail Co., 746 F.2d 323, 326 (6th Cir. 1984).

Nissan's and OnSite's failures to address the Grand Trunk factors has made it difficult for the Court to properly consider their motions. Accordingly, the Court will reserve ruling on Nissan's and OnSite's motions regarding this claim pending further briefing from Nissan and OnSite on whether the Court should exercise its jurisdiction over this claim under the Declaratory Judgment Act, using the Grand Trunk factors. See Kondaur Capital Corp. v. Smith, 802 F. App'x 938, 945 (6th Cir. 2020) (discussing district court ordering further briefing on Grand Trunk factors to resolve a motion for judgment on the pleadings or, in the alternative, for summary judgment on a declaratory judgment claim); see also Fed. R. Civ. P. 56(e) (providing that when a "party fails to properly support an assertion of fact. . . the court may. . . give an opportunity to properly support or address the fact" or "issue any other appropriate order"); Fed. R. Civ. P. 56 Advisory Committee Note to 2010 Amendment (orders authorized by Fed. R. Civ. P. 56(e) "should be designed to encourage proper presentation of the record").

## B. Breach of Contract

Nissan and OnSite's final dispute is whether either party is entitled to summary judgment on Nissan's breach of contract claim, which alleges OnSite breached the PSA when it hired Edmondson, Battle, and McGlory in violation of Section 5.2. (Case No. 3:23-cv-01071, Doc. No.

45

10 ¶¶ 41–48). The elements Nissan must prove to establish its breach of contract claim are the same as those in Section III.2.C, above.

### i. Nissan's Motion

Nissan moves for summary judgment on this issue, asserting there is no genuine dispute of fact that OnSite breached the PSA by hiring Edmondson, Battle, and McGlory, convicted felons, to work at Nissan's facility, and such breach resulted in damages in the form of Nissan's defense costs. (Doc. No. 114 at 30). Nissan's motion fails for the same reason OnSite's motion on its breach of contract claim failed. See supra, Section III.2.C.i. Nissan, as the one carrying the burden of establishing all elements of its contract claim, has failed to show there is no genuine dispute of material fact surrounding the circumstances in which OnSite hired Edmondson, Battle, and McGlory, despite their felony convictions. See supra, Section I.2. Accordingly, Nissan's motion will be denied on its contract claim.

### ii. OnSite's Motion

OnSite contends it is entitled to summary judgment because Nissan's claim suffers in three ways: (1) OnSite did not breach the PSA by hiring Edmondson, Battle and McGlory; (2) Nissan's damages from Plaintiffs' lawsuit are not recoverable because they were not foreseeable; and (3) Nissan's damages are void under federal law. (Doc. No. 122 at 6–8).

OnSite's first argument fails for the same reason Nissan's motion on its breach of contract claim fails. See supra, Sections I.2 and III.3.B.i. The fate of OnSite's third argument is the same. OnSite merely refers to its argument relating to Nissan's declaratory judgment claim that asserts Section 13 of the PSA is void under federal law. (Doc. No. 122 at 8). However, that argument provides no justification for OnSite's assertion that Nissan cannot bring its breach of contract claim under federal law. (See id.).

46

OnSite's second argument, while more intriguing, is no more successful. OnSite is correct that damages for a breach of contract are only recoverable if they may have been "reasonably supposed to have entered into the contemplation of the parties." BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc., 48 S.W.3d 132, 136 (Tenn. 2001) (internal quotation omitted). However, its unsupported assertion that "[n]o reasonable factfinder could conclude that the Edmondson Lawsuit naturally arose from OnSite's alleged violation of Section 5.2 of the PSA by hiring employees with felony convictions" is not sufficient to establish it is entitled to judgment as a matter of law. Rather, Nissan has pointed to evidence that a reasonable juror could find suggests the contrary, in that: (1) the parties entered into the PSA, which contained the Section 5.2 language; (2) in contravention of Section 5.2, OnSite hired Edmondson, Battle, and McGlory; and (3) OnSite had Edmondson, Battle, and McGlory perform PSA services, despite knowing they all had felony convictions. See supra, Section I.1. Although Nissan does not point to evidence indicating the parties contemplated these damages at the time they signed the PSA, a reasonable juror could find the "felony conviction" language in Section 5.2 suggests the parties contemplated these damages at the time of contracting. The myriad of disputed issues of material fact surrounding Nissan's breach of contract claim, including enforcement of the PSA, OnSite using Edmondson, Battle, and McGlory for PSA services, and Nissan's rationale for revoking Plaintiffs' facility access, are all best resolved by a jury. The Court finds that viewing the facts in the light most favorable to Nissan, there is a genuine dispute on whether its alleged contract damages are a foreseeable result of OnSite breaching Section 5.2. See supra, Sections I.1 and I.2. The Court will therefore deny OnSite's motion regarding Nissan's breach of contract claim.

## IV. CONCLUSION

For the foregoing reasons, Nissan's Motion for Summary Judgment on OnSite's claims and its counterclaims (Doc. No. 113) and Nissan's Motion for Summary Judgment on Plaintiffs'

47

Claims (Doc. No. 117) will be granted in part and denied in part. The Court reserves ruling on

Nissan's Motion for Summary Judgment on its counterclaims (Doc. No. 113) and OnSite's Motion

for Summary Judgment on Nissan's claims (Doc. No. 121) regarding Nissan's declaratory

judgment claim pending further briefing from the parties. Plaintiffs' Motion for Summary

Judgment (Doc. No. 82), OnSite's Motion for Summary Judgment on Nissan's Counterclaims

(Doc. No. 121), and OnSite's Motion for Summary Judgment on its Claims (Doc. No. 124) will

otherwise be denied.

An appropriate order will enter.


_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE